110 Cal.App.2d 683 (1952)
LOUIS BARTLETT, Respondent,
v.
PACIFIC NATIONAL BANK (a National Bank), Appellant.
Civ. No. 14943. 
California Court of Appeals. First Dist., Div. One. 
May 1, 1952.
 Cooley, Crowley & Gaither for Appellant.
 Scott Elder and Warren Olney III for Respondent.
 BRAY, J.
 Defendant appeals from a judgment in favor of plaintiff for $14,693.42 plus interest thereon at 7 per cent per annum from July 31, 1946, and costs.
 Questions Presented
 1. Does the contract for attorney's fees provide a lien?
 2. Were the escrowed bonds those of the corporation?
 3. Sufficiency of the findings.
 4. Statute of limitations.
 5. Rule of damages.
 Facts
 This litigation is based on a contract entered into by Provident Irrigation District Bondholders Protective Committee and Provident Land Corporation with plaintiff, an attorney at law. The Provident Irrigation District had defaulted its bonds. The committee had been formed by certain bondholders and held certain bonds. The corporation was thereafter *685 formed and title to most of these bonds was transferred to it. On May 7, 1936, plaintiff wrote a letter addressed to both the committee and the corporation, giving a statement of the suits and procedures on behalf of the bondholders which Bartlett recommended be brought to enforce the rights of the bondholders. Then follows the clause upon which this action is based:
 "My compensation for this work is to be retainer of $500.00 payable now, and one-fourth of all money recovered for the Committee and/or Corporation, whether by legal action or by compromise acceptable to the Committee and/or Corporation, and shall be payable upon receipt of the money by them. ..."
 "Summarizing the costs:"
 "Retainer of $500.00 payable now."
 "One-fourth of the money recovered with or without litigation."
 "Actual necessary expenses, estimated at $1000.00."
 The committee and the corporation accepted this proposition. It is conceded that it thereby became a binding contract. It will not be necessary to detail the services rendered by plaintiff under said contract as plaintiff obtained a judgment for said services in the sum of $33,150, against the committee and the corporation. (See [fn. *]Provident Land Corp. v. Bartlett, 72 Cal.App.2d 672 [165 P.2d 469].) There is a conflict in the evidence as to most of the facts from now on. There is substantial evidence to support the court's findings resolving this conflict in plaintiff's favor. About 1940 the corporation made an arrangement to get a loan from the R.F.C. enabling the district to discharge its bonded indebtedness. The R.F.C. was to purchase the bonds for 20 cents on the dollar par value. To accomplish this an escrow was set up with defendant bank by which the bonds were deposited to be delivered to the R.F.C. on receipt for the corporation of the agreed sum. George H. McKaig was president of the corporation and also one of the members of the committee. On September 28, 1939, the corporation transmitted to defendant bank 511 bonds authorizing it to deliver the bonds to McKaig's order on receipt for the corporation of a sum equivalent to 15 per cent of their par value. McKaig, the same day, wrote the bank directing it to deliver these bonds to the R.F.C. or the district upon receipt by the bank *686 for McKaig of a sum equivalent to 20 per cent of their par value. Bartlett learned of the intended R.F.C. purchase and on April 30, 1940, wrote a letter to defendant "as agent and escrow holder," in which he referred to the contract of May 7, 1936, and set forth the portion thereof hereinbefore quoted. He referred to the deposit of bonds with defendant and the intended loan from the R.F.C. Plaintiff then referred to the services he had rendered and the fact that defendant held in escrow bonds of the par value of $570,000 and would receive from the R.F.C. 20 per cent thereof, or $114,000; that under plaintiff's contract he was entitled to one-fourth thereof and that therefore, upon the receipt of the money by defendant, $28,500 would belong to him. He then referred to certain detached coupons in the escrow for which the R.F.C. was to pay the par value of $13,000, one-fourth of which, or $3,250, would also belong to plaintiff, making his one-fourth of all moneys to be received by defendant under said escrow $31,750. He added: "Your liability to account to me will arise by virtue of my contract of employment with the depositors of securities with you, and my services performed thereunder, as recited above, payment to you as agent of the depositors of the bonds and coupons, and this notice of my ownership of one- fourth of the moneys so received by you." Plaintiff then referred to Elliott v. Leopard Mining Co., 52 Cal. 355, "in which the circumstances were almost precisely similar, which states a universally accepted proposition of law." At the same time plaintiff sent a similar notice to the Bank of America and to the R.F.C. as to funds which might pass through their hands. Defendant's trust officer replied by letter, stating that the bank was merely an escrow holder, that any deviation from its instructions would expose it to liability to the depositors and that it could not assume such responsibility, and that it was advised that the Elliott case did not compel it to do so. It then invited plaintiff to discuss the matter personally. On May 17, 1940, plaintiff and the trust officer met in the latter's office. Plaintiff testified that he understood the trust officer to say that the bank would start an interpleader action to determine plaintiff's right to any of the money it might receive. May 22d, plaintiff wrote the bank to that effect. May 24th, the bank replied that although the matter of an interpleader action had been discussed, there had been no commitment to file such action. On the contrary, plaintiff had been advised that the bank would be governed entirely by its counsel's advice. "As yet, *687 we do not know what course we will be advised to pursue." September 19, 1940, the R.F.C. notified plaintiff that pursuant to his request the Federal Reserve Bank (acting for the R.F.C.) would withhold $31,750 from the purchase price of any bonds. In the meantime the bank consulted one of its firm of attorneys. The attorney knew that plaintiff was claiming an equitable interest in the money to be received. At first he indicated to the trust officer that it might be necessary to interplead. Then on May 24th the attorney advised the trust officer to the effect that the bank might have to consider carefully plaintiff's claim of an equitable interest in the proceeds from the bonds and advised that the bank refuse payment of the proceeds to the bondholders, thereby precipitating an interpleader action. However, McKaig and the corporation were anxious that the proceeds be distributed to the bondholders as soon as received by the bank. So on September 6th an agreement between the bank, McKaig and the corporation was entered into in which after stating that plaintiff had notified the bank that he had an "equitable interest" in the bond proceeds and was entitled to be paid thereunder $31,750, the bank agreed to pay to the bondholders all proceeds from the bonds when and as received, and McKaig and the corporation agreed to indemnify the bank against all claims. In addition the corporation agreed to deposit with the bank before such payment by the bank should be made, $28,000 as security for the indemnity promise of McKaig and the bank. The corporation also agreed to institute proper legal proceedings to determine the validity of plaintiff's claims. (This resulted in the Bartlett case.) The bank learned that the R.F.C. was to withhold $31,750. The bank's attorney advised the bank that to be fully protected it must insist that a fund of $31,750 be available for payment of any judgment plaintiff might obtain, and that the fact that the R.F.C. had a fund, while intended to, did not necessarily provide protection for the bank. Later, it was agreed between the bank, McKaig and the corporation that the bank would pay the bondholders upon receipt of the bond proceeds the full amount thereof "less the $31,750 retained by the" R.F.C. Between September 20 and October 8, 1940, the bank paid out (other than to Bartlett) all of the money received by it from the R.F.C. with respect to the 511 bonds. It also paid out the $28,000 above mentioned. It apparently relied upon the fact that the Federal Reserve Bank withheld from the moneys paid by it to the bank $31,750. *688 This amount the Federal Reserve Bank paid to defendant for plaintiff July 31, 1946, upon his giving the former a release of all claims against the R.F.C.
 Going back to 1940, plaintiff was served in the Bartlett case. Sometime between October 4th and 21st he and his attorney talked to the trust officer in the latter's office. Plaintiff claims he told the trust officer that it would be necessary for plaintiff to join the bank in that action as a defendant, "in order to be able to collect the money that was coming to me; that $31,750 was being withheld by the R.F.C., but that my claim might prove to be larger than that, and in any event interest would certainly accrue on it before the matter was determined, and that the bank--I would hold the bank responsible for the other amount, and I would have to make the bank a defendant in the action unless I received assurance from the bank that they would withhold sufficient funds to meet whatever judgment in excess of the $31,750 might be obtained. And ... [the trust officer] said, 'The bank is holding money enough to protect you.' 'Well,' I said, 'how much?' He said, 'Plenty, we are holding plenty.' " The trust officer then suggested that plaintiff take the matter up with its attorneys. Plaintiff then saw another member of the firm and told him "that I didn't want to sue the bank if I had the assurance that the bank was holding out enough money to protect me. And he gave me the assurance that the bank would hold out whatever was necessary." On October 21st plaintiff wrote defendant stating, among other matters, that he had been informed that it had received about September 20, 1940, from the R.F.C. approximately $95,250 and that one-fourth thereof was owned by him and he was making demand therefor, and further, that one-fourth of the balance to be paid by the R.F.C. also belonged to him. Early in November plaintiff and his accountant went to the bank to get data to be used in the Bartlett case. Plaintiff testified that he then was informed that the bank was withholding funds to take care of his claim. When he asked the trust officer the amount, the latter referred him to the bank's attorneys, "but there is plenty to take care of your claim." Plaintiff saw the bank's attorney about getting information which he desired for use in the Bartlett suit. There followed certain transactions with the attorney, the trust officer's secretary, and an examination of certain records of the bank. In none of these transactions did the bank disclose that, disregarding plaintiff's notice, it had paid out all the bond money. It was not until the fall of *689 1942 that plaintiff learned that the bank did not withhold any money but had paid it all out. This action was brought within 18 months of the time plaintiff claimed he first learned that defendant was no longer withholding money for him. The trust officer and the bank's attorney admitted the fact of the conversations testified to by plaintiff but denied the essential parts thereof. There is substantial evidence to support the court's finding that the $31,750 paid by defendant to plaintiff on July 31, 1946, was the money withheld by the R.F.C. pursuant to plaintiff's notice to the latter and was not any money withheld by defendant pursuant to plaintiff's notice to defendant.
 1. Lien.
 [1-4] Ordinarily an attorney does not have a lien for his services, not even where he has a contract for the payment of a contingent fee. (Rosenberg v. Lawrence, 10 Cal.2d 590 [75 P.2d 1082].) "But the attorney may secure such a lien by contract. [Citations.] In order to create such a lien the parties are not required to use the word 'lien' in their contract. The real question in each case is, whether or not the parties have contracted that the lawyer is to look to the judgment he may secure as security for his fee. If so, an equitable lien is created. ... Such a lien is, in reality, an equitable assignment for security, and is fundamentally different from a power coupled with an interest. The equity courts look with favor upon equitable liens and frequently such liens are employed to do justice and equity and to prevent unfair results. [Citations.]" (Wagner v. Sariotti, 56 Cal.App.2d 693, 697-698 [133 P.2d 430].)
 [5] The court found that in and by the contract it was agreed that plaintiff's compensation would be a lien upon the money recovered and payable out of it upon receipt thereof by the corporation and the committee. Our task, then, is to determine whether there is any substantial evidence to support this finding. It is obvious from the situation at the time of the making of the contract that it was contemplated that plaintiff's compensation could only come from the moneys recovered from the bonds. Neither the committee nor the corporation had, or would have, any other funds. This fact alone would not establish a lien or even that the parties contemplated one. It occurs in most of the contingency fee contract cases. Here, however, it is a circumstance to be considered in view of the commitments later made by defendant *690 to plaintiff as bearing on the interpretation of the contract made by defendant and the parties to it. From the very beginning plaintiff claimed an equitable interest in the proceeds of the bonds. As soon as plaintiff learned of the proposed sale of the bonds he notified defendant, the R.F.C. and the Bank of America that he claimed one-fourth of all moneys they might receive. The trust officer of the bank and its attorney knew that plaintiff claimed such equitable interest. In the indemnity agreement of September 6, 1940, between defendant, McKaig and the corporation, reference is made to the fact that plaintiff had served notice upon the bank that "under and pursuant to" the agreement of May 7, 1936, "he had an equitable interest in the proceeds of sale of the bonds of the District, and particularly the 511 bonds deposited by McKaig. ..." The agreement then stated that the bank had communicated to McKaig its intention to withhold the $31,750 mentioned in plaintiff's notice, and the purpose of the agreement was to indemnify the bank so that it would pay the proceeds of the bonds to the bondholders without awaiting the outcome of the suit to be brought by the corporation to test plaintiff's claims. In 1942 when plaintiff learned that the bank was not withholding any moneys he told the bank's attorneys in effect that if he knew to whom the moneys were disbursed he could follow the money. The record fails to show any indication that either the committee or the corporation prior to suit ever disputed that if plaintiff was entitled to any compensation he had an equitable interest in the bond proceeds. They, of course, disputed his claim to compensation in any amount, but at no time did they attack his claim of a lien. Coupling together the fact that the only possible source of compensation was the bond proceeds, the language of the contract "payable upon receipt of the money by them" and "one-fourth of all money recovered" (see Bennett v. Potter, 180 Cal. 736 [183 P. 156], where the court interpreted the phrase that the attorneys should receive "as their compensation ten (10) per cent of whatever is recovered" to mean, not 10 per cent of the value of whatever is recovered, but of the thing itself), the apparent interpretation of the contract by the parties to it, the agreement of defendant to withhold, and all the circumstances of the case, there is substantial evidence to support the court's finding that a lien was created. We add, that the evidence is susceptible of a contrary interpretation, but as such interpretation is not compelled by the evidence we are bound by the court's determination. *691
 In Provident Land Corp. v. Bartlett, supra, 72 Cal.App.2d 672, the court said: "Bartlett occupied the position solely of a creditor of the corporation and the committee. He was neither a bondholder nor a stockholder." (P. 687.) Defendant contends that such language constituted a holding that plaintiff was not a lienholder. It has no such effect. Whether plaintiff was or was not a lienholder was not an issue in that case. The court was discussing alleged misconduct of the members of the bondholders' committee and said that such misconduct, if any, could not injure plaintiff "unless that misconduct prejudiced his position as such creditor." (P. 687.) In the sense used there, the term "creditor" would include a lienholder.
 [6] It is true that the contract having been drawn by plaintiff, an attorney, is to be construed most strongly against him. (Bennett v. Potter, supra, 180 Cal. 736.) However, such rule does not compel a finding against plaintiff where, applying such rule, the evidence still shows that the intention of the parties was as contended by the attorney.
 Defendant cites a number of cases such as Morrison v. Havens, 24 Cal.App.2d 504 [75 P.2d 515], in which it has been held that language in an agreement somewhat similar to that in the agreement here does not create a lien. Those cases are distinguishable from ours for the reason that either there was no evidence other than the bare words of the agreement to show the intention of the parties, or on conflicting evidence the trial court found against the lien theory.
 2. Ownership of Bonds.
 [7] Defendant contends that the 511 bonds escrowed with defendant belonged to McKaig and hence plaintiff's lien could not attach thereto. [fn. *] It is a little difficult to understand the true situation, as the corporation or McKaig in one escrow was to get 20 cents on the dollar for its bonds from the R.F.C., but in the other escrow the corporation was to get only 15 cents on the dollar from McKaig, its president and member of the bondholders' committee, apparently giving him a 5 per cent profit. The instructions by the corporation in the first escrow, # 1259, stated that the bonds were deposited "for the purpose of effecting a sale of all thereof by Mr. George H. McKaig *692 for this Corporation" at 15 cents on the dollar. (Italics added.) Although the indemnity agreement recites that McKaig had purchased "the bonds from Provident" the evidence justifies the conclusion that McKaig was acting for the corporation and the defendant knew it. In any event, the evidence amply supports the court's finding that McKaig's interest, if any, was derived with full notice and knowledge of plaintiff's interest in the bond proceeds.
 3. Findings.
 Defendant attacks many of the findings as being contrary to the law and evidence, conflicting and contradictory. It is unnecessary to discuss these in detail. The main criticism is based upon the contentions (a) that plaintiff had no lien, (b) that the bond proceeds received by the bank belonged to McKaig and not to the corporation or committee, and hence the findings to the contrary were erroneous. We have heretofore shown that the facts were as found by the court and not as contended by defendant.
 [8] The court found that the $31,750 paid by defendant to plaintiff on July 31, 1946, was received by defendant that day from the R.F.C. for plaintiff and was not moneys withheld for plaintiff under the notice to withhold theretofore given defendant by plaintiff, and that, in effect, plaintiff properly applied that sum first in payment of interest due him on his judgment against the corporation, leaving a balance due him thereon of $14,693.42 together with interest from July 31 at 7 per cent per annum. Defendant contends that this finding is improper because, among other things, plaintiff's notice to withhold, while it stated that he was entitled to one-fourth of the proceeds of the bonds, mentioned the specific sum of $31,750, and plaintiff had actually received that sum, even though he received it indirectly from the R.F.C. Perhaps if plaintiff were relying solely on the written notice of April 30, 1940, this contention might apply. However, it overlooks the testimony of plaintiff, evidently believed by the court, that early in October, 1940, he told the trust officer "my claim might prove to be larger" (than the $31,750) "and in any event interest would certainly accrue on it" and that he would hold the bank "responsible for the other amount," and was informed by the trust officer that the bank was withholding plenty to protect plaintiff. The same day he saw the bank's attorney who assured him, after being told that plaintiff wanted to be protected in the event that the amount withheld *693 by the R.F.C. proved to be insufficient, that "the bank would hold out whatever was necessary." In both these conversations plaintiff definitely stated that unless he secured the bank's assurance that sufficient moneys were withheld he would have to sue the bank or interplead them in the suit brought by the corporation. The bank people stated that they did not want such action taken. In view of these conversations and the notices to withhold given, the bank is estopped to deny that the lien held by plaintiff included interest. Moreover, the bank had no right to assume that the $31,750 withheld by the R.F.C. relieved the bank of its obligation to see that plaintiff received all he was entitled to. Nor could the fact that plaintiff testified that in giving notice to defendant, the R.F.C. and the Bank of America, he had not contemplated that there would be withheld three times $31,750, change the situation. The effect of such notices was that each one notified was required before paying any money to or for the corporation to see that plaintiff's claim was fully paid or that, regardless of what the others were doing, the one held back sufficient sums to protect plaintiff.
 4. Statute of Limitations.
 The court found that the conversion took place between September 20 and October 8, 1940. Plaintiff testified that he did not discover that the bank was not withholding moneys to protect him until the fall of 1942, less than two years before the institution of the action. Defendant contends that the evidence shows that plaintiff knew in 1940 that the bank was not withholding moneys for him. This contention is partly based upon plaintiff's letter to his attorney of October 7, 1940, in which plaintiff said he was considering suing the bank for the money due him. This letter does not necessarily establish that plaintiff then knew the bank was not going to withhold. The purpose stated in the letter is that such a suit might assist plaintiff in getting certain information from the bank for use in the case of the corporation against plaintiff. Nor does the letter of October 21, 1940, to the bank necessarily show knowledge by plaintiff of the bank's failure to withhold. In that letter plaintiff states that he is informed that the bank has already received from the R.F.C. approximately $95,250 and demanded immediate payment of one-fourth thereof. Nor does his failure to follow this letter by suit start the statute running. It was after this that plaintiff received assurances that his money was being withheld. In the meantime *694 the case of the corporation against plaintiff was proceeding. In his cross-complaint in the action brought against him by the corporation, plaintiff asked that the contract by which the corporation was apparently selling 511 bonds to McKaig be cancelled and any and all sums received by McKaig through transactions with the corporation be restored to the corporation. Again the knowledge of the deal between McKaig and the corporation and that the bank had paid moneys to McKaig would not necessarily be knowledge that the bank was not holding back sufficient moneys to protect plaintiff as it had promised. The evidence supports the trial court's conclusion that in such examination of the records as was permitted plaintiff and his auditor, the records showing the payment of all money by the bank were not revealed. These writings and other circumstances in the case could be considered to raise an inference that plaintiff then knew defendant had not kept its agreement, but do not compel such inference.
 [9] Ordinarily the statute of limitations runs from the date of conversion and lack of knowledge by the injured party does not toll the statute. (Nighbert v. First Nat. Bank of Bakersfield, 26 Cal.App.2d 624, 633 [79 P.2d 1105].) However, here the court found, and the evidence supports such finding, that between April 30, 1940, and October, 1942, defendant fraudulently represented to plaintiff that it was respecting his notices and demands and was withholding sufficient moneys for him and fraudulently concealed the fact of the conversion of his money by it, and that the fraud was practiced to conceal such fact from him and to induce him not to involve defendant in the litigation then pending, that plaintiff believed the misrepresentations and was thereby induced to make no further inquiry or investigation. These facts bring the case under the rule set forth in Pashley v. Pacific Elec. Ry. Co., 25 Cal.2d 226 [153 P.2d 325]: "... when the defendant is guilty of fraudulent concealment of the cause of action the statute is deemed not to become operative until the aggrieved party discovers the existence of the cause of action. [Citations.] ... '... in all cases a fraudulent concealment of the fact, upon the existence of which the cause of action accrues, is a good answer to the plea of the Statute of Limitations.' " (P. 229.) "In reality the ground of relief is that the defendant, having by fraud or deceit concealed material facts and by misrepresentations hindered the plaintiff from bringing an action within the statutory period, is estopped from taking advantage of his own wrong." (P. 231.) *695
 5. Rule of Damages.
 In its closing brief, and apparently not raised theretofore, defendant contends that the rule of damages should be not as set forth in section 3336 of the Civil Code, which in cases of wrongful conversion allows the recovery of interest, but as set forth in section 3338, which states: "One having a mere lien on personal property, cannot recover greater damages for its conversion, from one having a right thereto superior to his, after his lien is discharged, than the amount secured by the lien ..." (plus compensation for time and money expended in pursuit of the property--not applicable here). As we have heretofore pointed out, the lien under the circumstances of this case did include interest, and therefore interest was included in "the amount secured by the lien." If under this section defendant can be considered to be "one having a right thereto superior" to plaintiff and if the lien did not include interest, defendant, by reason of its conduct in promising to withhold sufficient moneys to cover interest as well as principal, in consideration of plaintiff's not interpleading it in the prior litigation, is estopped to contend that plaintiff's lien did not include interest or that plaintiff is not entitled to recover interest.
 The judgment is affirmed.
 Peters, P. J., and Wood (Fred B.), J., concurred.
NOTES
[fn. *] *. Hereafter referred to as "the Bartlett case."
[fn. *] *. There were additional bonds escrowed, apparently belonging to certain bondholders rather than the corporation. Inasmuch as plaintiff makes no claim as to the proceeds of any of them, we have disregarded them throughout this opinion.