[Civ. No. 33780. Second Dist., Div. Five. Aug. 26, 1970.]

EDWARD J. SKELLY, Plaintiff and Respondent, v.
MATTHEW M. RICHMAN et al., Defendants and Appellants.

## COUNSEL

Joseph W. Fairfield, Ethelyn F. Black, Alfred W. Omansky, Margolis, McTernan, Smith, Scope & Herring, Margolis & McTernan and Ben Margolis for Defendants and Appellants.

Raymond, Noriega & Robinson and Mark P. Robinson for Plaintiff and Respondent.

## OPINION

**REPPY, J.—**

### UNDERLYING CIRCUMSTANCES

The following facts emerge from a lengthy transcript construed favorably to the successful plaintiff with some emphasis on conflicting aspects which are significant to contentions made by defendants and with one or two concessions by plaintiff somewhat adverse to his position.

Robert J. Schmorleitz (Schmorleitz) and Edward J. Skelly (Skelly), both attorneys, had offices in the same building. They were not partners or regular associates but occasionally referred business back and forth.

A. V. Bamford (Bamford) was a sometime client of Schmorleitz. Bamford had a cause of action against Edward M. Granz (Granz) for substantial monies (disputed as to specific amount) which had been withheld by Granz from Bamford in connection with a joint venture the two had carried out. It eventuated that the dispute had to be tried in court. Schmorleitz had Bamford take the case to Skelly because the latter was a trial attorney. An independent attorney-client relationship was created between Skelly and Bamford. They orally agreed to a fee arrangement whereby Skelly's fee would be contingent upon recovery of monies from Granz and payable therefrom, and whereby the amount of the fee would be 25 percent of the monies recovered.[1] Skelly was to be solely and completely in charge. How-

---

[1] There was considerable evidence of a conflicting nature about certain monies advanced by Bamford to Skelly; the amount thereof; when it was supposed to be and actually was advanced; what it was supposed to be used for or applied to. The conflict is readily resolvable against a claimed defense version that it was in excess of $1,000 and was a straight trial retainer fee (countering the contingent percentage-of-recovery fee evidence). The most plausible version is that the amount advanced was around $500 and that it was to be used for costs, with any unused portion to be credited against the percentage fee if earned by a recovery. The evidence supports the proposition that the latter contingency never became of moment, because all such advances (and another one made during trial to secure an expert witness) were expended for litigation costs.

ever, Schmorleitz' name appeared on the complaint. Skelly had agreed to give Schmorleitz, as a referral fee, one-third of whatever his contingent fee amounted to.

Before the trial Skelly proposed that the fee percentage be raised to 40 percent. Bamford did not accede to the suggestion, and the original oral agreement was confirmed by an exchange of telegrams.

Some degree of mutual dissatisfaction developed between Bamford and Skelly having to do with advancement of funds for costs and delay in getting to trial; but there was no actual disruption of the attorney-client relationship.

The court trial eventually commenced. Granz was represented by an attorney named William Israel (Israel). During the course of the trial, Granz came up with more offsets against Bamford's claims than was expected. On the basis that the lesser amount which now appeared to be recoverable made it equitable, Skelly again proposed to Bamford that the fee percentage be increased to between 33⅓ and 40 percent. Bamford agreed in principle, but the exact figure was left open to future negotiation.

While the trial was in progress, a person by the name of Hovious, who had a judgment against Bamford in about the sum of $5,000, perfected a lien therefor against any recovery Bamford might secure from Granz.[2]

Eventually judgment was rendered in favor of Bamford and against Granz in the sum of $9,559.03 (principal plus interest to date of judgment) with $122.25 costs.

After the trial Granz substituted Matthew M. Richman (Richman) as his attorney instead of Israel. Richman made a motion for new trial on behalf of Granz which was denied. At the courthouse, after the denial, Richman, with Granz present, asked Skelly if the judgment could be paid off at a reduced figure, indicating that he was going to appeal[3] and stating his feeling that he had a particularly good basis for establishing trial court error in the disallowance to Granz of an additional claimed offset of about $2,000. Bamford was in Texas at this time, and Skelly advised Richman that he

---

[2] A suggestion crops up in the record that Skelly may have entertained the thought that the recovery figure to which his 25 percent fee would apply would consist of whatever turned out to be the total monetary figure of the judgment less the amount of the Hovious judgment lien and that this was further reason for his proposal of the increased percentage for his contingent fee. However, the suggestion is far from compelling, and there is as much, if not more, support for the position that the total amount of monies ultimately to be recovered from Granz would be used to measure the fee, even though some of such monies had to be devoted to defraying the Hovious lien.

[3] Richman did file a notice of appeal for Granz.

would communicate with him and recommend such a settlement to him. Skelly then pointed out to Richman and Granz that he had a percentage fee contingent upon and payable from recovery and said that he would be willing to cut it some to make settlement attractive to Bamford.[4]

Skelly entered into correspondence with Bamford about the financial exigencies (including additional attorney's fees for appellate work, either straight retainer or increased percentage of recovery)[5] of the pending appeal and the advisability of settlement at the suggested reduced figure. Bamford did not desire to settle; he wanted to recollect the full amount of the judgment.[6] Skelly advised Richman of Bamford's disinclination, and, upon inquiry by Richman, authorized Richman to contact Bamford directly and personally to see if he (Richman) could persuade him (Bamford) to settle. Skelly reminded Richman of his contingent-fee status, and Richman told Skelly that he would protect him with respect to his fees.[7]

As a courtesy to Richman, still figuring it would be beneficial to his client to settle, obviously hoping that he could get him to come over to this viewpoint, and reasoning that there would be a better chance to settle if Granz did not have to pay out funds for transcripts and briefs on appeal, Skelly executed and delivered to Richman a 60-day extension[8] of time within which to designate and make deposits for the record on appeal. Richman kept the stipulation in his office; did not file it with the clerk. Skelly advised Bamford that he had taken this action. Bamford was provoked and wrote Skelly that he had wired the clerk to "dismiss it."[9] Skelly ignored this communication, appraising it as a grandstand threat which would not be carried out. However, Bamford had so telegraphed the clerk of the Court of Appeal. The clerk replied by letter to the effect that Bamford would have to

[4]Although the record lacks specifics the tenor of the testimony suggests that apparently what Skelly had in mind was something like taking a 20 percent instead of a 25 percent portion of what would be the new (and actual) recovery figure of about $7,600 ($9,600 minus $2,000).

[5]The oral agreement was silent on the subject of appeal. Eventually Skelly agreed to resist the appeal under the 25 percent arrangement.

[6]The record indicates that at one point Bamford was leaning toward a counter proposal of a $1,000 reduction.

[7]At one point thereafter, before the parties themselves got together directly and personally, Richman showed Skelly a settlement check in the proposed reduced amount which named both Bamford and Skelly as payees.

[8]Stipulating to a 60-day extension was not in accordance with the rules of court which call for such extensions to be in increments not to exceed 30 days each up to a total of 90 days. (Rules of Court, rules 5(a), 5(c) and 45(b).)

[9]Skelly claimed that he construed this language to mean that Bamford was only asking for the expulsion of the extension stipulation, thinking it must have been filed; defendants asserted that Bamford's attention was directed at actually moving to dismiss the appeal. The latter appears to have turned out to be the correct appraisal in light of Bamford's ensuing action.

notice a motion and support it with a certificate from the clerk of the superior court showing that Granz was in default of perfection of the record. On November 20, 1962, without telling Skelly or sending him copies of the papers, Bamford did secure the necessary default certificate from the clerk of the superior court (which could be issued because Richman had not filed the extension stipulation) and submitted a written notice to dismiss the appeal to the Court of Appeal supported by said certificate, with copies of the papers going to Richman. Accompanying the motion Bamford sent a letter stating that his attorney would not appear because he and his attorney had differences with some aspects of the case and requesting that the motion be granted on the papers submitted.

About this same time Richman told Granz that Skelly had authorized either of them (Granz or Richman) to contact Bamford directly to see if the judgment could be compromised, although, as indicated above, Skelly had authorized only Richman to make such a contact. Granz, at first, made long distance overtures to Bamford, which apparently were sufficiently promising to prompt Granz to go to Texas. Before doing so, Granz bought up, or contracted to buy up, the Hovious judgment at a discount and thus put himself in a position to give to, or get for, Bamford a release and satisfaction of the Hovious judgment.

Granz went to Texas in the middle of December 1962 and secured the services of an attorney, Arthur Gochman (Gochman), to assist him in processing any settlement he might make with Bamford. Granz contacted Bamford, and they agreed that Granz would pay Bamford $4,930 and would furnish Bamford within 15 days a release of the Hovious judgment, or, in lieu thereof, would pay him an additional $5,037. Gochman told Bamford that Granz had acquired the Hovious judgment.

Granz had Bamford come with him to Gochman's office so that the payoff of the Bamford judgment against Granz could be documented and consummated. Gochman asked about Bamford's attorney and his fee status. He evidently was told that Bamford had displaced him. Gochman became concerned and called Richman for information and instructions. Richman told Gochman that Bamford's attorney had been paid and was out of the picture, and he instructed Gochman as to the nature and contents of the documents to be prepared. Accordingly, Gochman made up a document reciting the agreement, a substitution of attorneys whereby Bamford substituted himself (*pro se*) for Skelly which did not call for the signature of Skelly, and, on a California printed form, a satisfaction of judgment with provision for the signature of Bamford where normally the signature of the

attorney would be placed. He had Granz provide a check for $4,930, payable to Bamford only. Although there was some skirmishing by Granz to get away with the satisfaction of judgment without Bamford having in hand a signed copy of the agreement to release the Hovious judgment, the papers and check eventually were exchanged.

Granz came back to Los Angeles where he tried to file the satisfaction of judgment in the superior court. It was not accepted because it was not signed by Skelly, who was still the attorney of record and because Gochman's notarial signature was not exemplified by the Texas clerk. Apparently the unilateral substitution of attorneys was also unacceptable. Thereupon, Granz sent the papers back to Gochman for revision, who, in turn, sent them on to Richman.

Meanwhile, the appellate court dismissed the appeal, and Richman called Skelly and told him of this and of how Bamford and Granz had settled out the judgment, claiming, when Skelly angrily accused him of failing to protect him on his fees, that he had not known that Skelly was on a contingent fee, but thought he had been fully paid. Skelly told Richman that he was going to sue him and Granz.

Skelly talked to Bamford on the telephone from Los Angeles to Texas, and Bamford said that he had no intention of paying Skelly a fee and told him to go ahead and sue him. Richman wrote Gochman saying, in effect, that he (Gochman) had done everything on his own and that he (Richman) would take no responsibility for what might follow.

Granz came to see Skelly and urged him to sue Bamford; he advised that Bamford owned a one-half interest with him (Granz) in 35 acres of Lancaster property which could be attached. Skelly cried, "To hell with the 35 acres," and said that he was betrayed and was going to sue Richman and Granz.

### The Instant Suit

Skelly retained the services of Mark P. Robinson, who is his attorney on this appeal. A single action was filed against Bamford (first three causes of action) and against Richman and Granz (fourth cause of action). Skelly and Schmorleitz were named as plaintiffs in the complaint, and all causes of action contained allegations that the attorney's fee obligation of Bamford was owed to both of them.

The first cause of action against Bamford was for the reasonable value of legal services rendered to him at his special instance and request and, thus, was not based on a 25 percent contingency contract. The second cause of action against Bamford was for an account stated. The third cause of action

against Bamford was for money had and received. The fourth cause of action (the one against Richman and Granz only) alleged the contingent fee contract, defendants' knowledge thereof, the judgment against Granz, and defendants' inducement of Bamford to breach the contract. Bamford was never served. Richman and Granz were served, and the fourth cause of action was put at issue by their answers. The fourth cause of action was brought to trial over the objection of defendants that Bamford was a necessary party to the overall action and could be brought before the court on an *in rem* basis by attachment of his interests in the Lancaster real estate and the making of substituted service.

On March 20, 1967, prior to trial, Schmorleitz filed a request for entry of dismissal as to all defendants. Dismissal was entered March 28, 1967. The trial commenced December 20, 1967.

At the commencement of the trial, Skelly dismissed the second cause of action (for an account stated), and shortly thereafter he dismissed the remaining causes of action against Bamford.

We set out some of the circumstances of the trial because they are involved in the contentions of defendants.

During the course of the trial, Skelly proved his contract for a fee amounting to 25 percent of and being contingent upon, and payable from, the recovery of monies from Granz by testifying as to the exchange of words between himself and Bamford and by introducing the telegrams, all over the objection of defendant that they were hearsay and that the latter lacked authenticating foundation as well.

During the course of the trial, A. G. P. Steffes (Steffes), a veteran trial attorney, testified in effect that the following, among others, were customs and practices of the legal profession: the filing of a satisfaction of judgment, which he defined, would be handled by the attorney; where an attorney permitted opposing counsel to negotiate with his client, the negotiations would proceed to a meeting of the minds as to amount and then the entire matter would go back into the hands of respective counsel to prepare releases, satisfactions, or other documents in order to finalize the settlement; where a defendant's attorney was given authorization by a plaintiff's attorney to have the defendant negotiate directly with the plaintiff, the defendant's attorney would inform his client that such permission had been given, that he and the plaintiff could get together and determine an amount for satisfaction of judgment, but that when it got to that point, then he should inform him (counsel) of that circumstance, and that thereupon defense counsel would give a full explanation to the plaintiff's attorney and the attorneys would proceed to clean up the case by a satisfaction.

Steffes was then asked to give his opinion as to the reason for such customs. Over objection the court ruled that the witness was "entitled to express his reason for [his expert opinion]" as to the customs and "the . . . reason for this custom and practice." The witness then testified that "it is . . . a matter of ethics among lawyers, that . . . [they] try to see that everybody gets what they have coming to them justly, and in doing that you keep everybody informed . . . of what is happening, so that they can protect themselves as they go along. . . ." He added, "[T]hat is . . . the reason for the custom, and the reason for my opinion as to the custom."

At the close of the trial, the court gave among others, the following instructions to the jurors. The instruction numbers are given parenthetically at the end of each excerpt.

"A plaintiff who has suffered harm as a . . . result of an . . . interference by a third person with a contractual relationship either by unlawful means or by means otherwise lawful when there is a lack of sufficient justification is entitled to recover . . . from said third person.

"[T]o [secure] a verdict . . . in an action for interference with a contractual right, each of the following elements must be established . . .: 1. [T]here was a valid and existing contract; 2. The defendant had knowledge of the contract and intended to induce its breach; 3. The contract was in fact breached . . .; 4. The breach was caused by the defendant's unjustified and wrongful conduct;[10] 5. [T]he plaintiff has suffered damage." (Court's No. 1.)

"Where a client agrees that an attorney is to have a fee based upon a percentage of whatever amount is recovered . . . and is to be paid from the sum . . . recovered, the attorney has a lien upon any funds paid in . . . satisfaction of that action. ¶ The attorney's lien . . . is a contractual right which is subject to protection from unlawful interference." (Court's No. 2.)

"An attorney acting in litigation has the authority to . . . receive money claimed by his client . . . during the pendency [of the action], or after judgment, unless a revocation of his authority is filed, and . . . to . . . acknowledge satisfaction of the judgment." (Part of plaintiff's No. 12.)

"Where there is an attorney of record representing a party in an action the court does not recognize anyone in the conduct of the case except the attorney of record. . . ." (Part of plaintiff's No. 13.)

---

[10]It would have been preferable if the words had been "wrongful or unjustified" and if there had been added, "inducing the other contracting party not to perform." However no real error is present.

"Section 284 of the Code of Civil Procedure . . . provides: 'The attorney in an action . . . may be changed at any time before or after judgment [when mutual consent is not presented] . . . [u]pon the order of the court, upon the application of either client or attorney, after notice from one to the other except that in all civil cases in which the fee . . . of the attorney is contingent upon the recovery of money, in which case the court shall determine the amount and terms of payment of the fee . . . to be paid by the party.' " (Court's first unprinted instruction.)

"Section 285 of that Code provides: 'When an attorney is changed, as provided in the last section, written notice of the change . . . must be given to the adverse party. Until then he [the adverse party] must recognize the former attorney.' " (Court's second unprinted instruction.)

On January 3, 1968, the jury rendered a verdict in favor of Skelly for $2,500 actual damages (as against both Richman and Granz) and for $1,250 exemplary damages (as against Richman) and for $1,250 exemplary damages (as against Granz).

## DISCUSSION

There are numerous contentions which we take up seriatim.

■ 1. Defendants urge that Skelly committed himself to forms of action against Bamford (value of services, account stated, and money had and received) the breach of none of which Skelly claimed Granz and Richman induced as he did the contingent fee contract. Defendants contend that plaintiff should not be permitted to claim that they induced the breach of a contract which, in his counts against Bamford, he does not assert he had with him.

However, a plaintiff is permitted to plead inconsistent or, as Witkin prefers, alternative counts. (2 Witkin, Cal. Procedure, Pleading, §§ 181, 182, 184, pp. 1160-1163.) Moreover, the counts against Bamford were dismissed. Finally, the count against Bamford for money had and received[11] (third) can be rationalized as based on the contingent fee contract on the concept that Bamford had collected the judgment, which Skelly had successfully obtained for him, in money and the equivalent thereof (the Hovious release from Granz), and held Skelly's 25 percent for him.

■ 2. Defendants contend that Bamford was an indispensable party because he was one of the two contracting parties, or, at least, that Skelly, in order to mitigate defendants' damages, had to proceed against Bamford

---

[11]Defendants point out the incongruity that Skelly alleged as the date for the receipt July 6, 1962 (the date of judgment). The proof, of course, established the time of receipt of funds as December 1962 when the liquidation of the amount of the judgment occurred. The pleading mistake was harmless.

under *in rem* jurisdiction, by attaching his real property interest in California and effecting substituted service; that Skelly should not have been allowed to go to trial against only Granz and Richman on the fourth cause of action. We do not agree. Skelly did not have to pursue his causes of action against Bamford. (26 A.L.R.3d 679, 693 and 698 citing *Lurie* v. *New Amsterdam Cas. Co.* (1936) 270 N.Y. 379 [1 N.E.2d 472]; *Wise* v. *Southern Pac. Co.*, 223 Cal.App.2d 50 [35 Cal.Rptr. 652].) He could prove his contract, as he did, in the breach inducement action against Granz and Richman even though he did not establish it in an action against Bamford. Either side could have produced Bamford's testimony on the contract issue by in-court or deposition appearance. Although Bamford's dereliction was a breach of contract, he and Granz and Richman were somewhat in the status of joint tortfeasors against any of whom the complainant can press his charge. (2 Witkin, Cal. Procedure, Pleading, §§ 76, 95, pp. 1054, 1073-1074.)

■ 3. Defendants further assert that the dismissal by Schmorleitz extinguished the required performance by Bamford, the refusal of which Granz and Richman had induced, because the obligation of Bamford was alleged to have been owed jointly to Skelly and Schmorleitz and the rule is that a release by one of joint obligees is binding on all. However, as the proof came out, there was support for the proposition that Skelly was Bamford's only attorney in the accounting action against Granz and that the inclusion of Schmorleitz' name on the complaint was just a matter of deference to him and to permit him to make an occasional accommodation, nonadversary appearance. Bamford owed a fee only to Skelly. Skelly's arrangement with Schmorleitz to remit him a referral participation in the fee, which was strictly between counsel, probably led to the statement in Skelly's complaint against Bamford and Granz and Richman that the fee was owed to Skelly and Schmorleitz. In light of the dismissal and the proof, that allegation must be considered as inadvertent. Schmorleitz was not properly a party plaintiff in the second action. His action of dismissing was, in effect, a withdrawal (*Cook* v. *Stewart McKee & Co.*, 68 Cal.App.2d 758, 761 [157 P.2d 868]) and thus was appropriate. Granz and Richman were not misled or prejudiced.

■ 4. Defendants contend that the dismissal by Skelly of all his causes of action against Bamford terminated his rights against him which, in turn, made the case against Granz and Richman untenable. They extract from the context of *King* v. *Superior Court,* 12 Cal.App.2d 501, 507 [56 P.2d 268], the language that "A dismissal of an action has the effect of terminating it, and the rights of the parties . . . are concluded as though the case

had been determined on its merits. . . ."[12] However, this was a gratuitous observation; the significant question in that case was whether it had been dismissed before trial. The observation is contrary to the general rule that a plaintiff's voluntary dismissal effects a withdrawal of his claim and leaves the defendant as though he had never been a party (*Cook* v. *Stewart McKee & Co., supra,* 68 Cal.App.2d 758, 761); that an action merely commenced and then dismissed without trial determines nothing and concludes no one (*Davenport* v. *Turpin,* 43 Cal. 597 [overruled on another point in *Burns* v. *Hiatt,* 149 Cal. 617, 625-626 (87 P. 196)]); and that a voluntary dismissal is not like a judgment after trial. (*Lake* v. *Sterling,* 220 Cal.App.2d 35 [33 Cal.Rptr. 584].)

■ 5. Defendants claim that there were two impediments which forestalled the required proof of the existence of a contract. One is that Skelly's testimony of the exchange of words and the telegrams were inadmissible hearsay and that the latter lacked foundation as well.

We are satisfied that proof of the background circumstances up to the point when the telegrams were exchanged plus their obvious relation to each other and the trial court's acceptance of the credibility of Skelly formulated an adequate foundation of the identity and purpose of the transmittors. (Evid. Code, § 1420.)

The oral and written statements of the negotiating parties were verbal acts establishing a legal relationship. Wigmore points out that evidence of this type ". . . is circumstantial, not testimonial; and it is therefore not obnoxious to the Hearsay Rule, nor needs for its admission any Exception to that rule." (6 Wigmore on Evidence (3d ed. 1940), § 1790, p. 239.) "To such a use [to prove a specific state of mind] . . . the Hearsay Rule makes no opposition, because the utterance is not used for the sake of inducing belief in any assertion it may contain. The assertion, if in form there is one, is to be disregarded, and the indirect inference alone regarded. This discrimination, though well accepted in the law, is easy to be ignored, and it needs perhaps to be emphasized." (*Ibid.* at p. 238; see also *Smith* v. *Whittier,* 95 Cal. 279, 293 [30 P. 529]; *Johnson* v. *Nicholson,* 159 Cal. App.2d 395, 411 [324 P.2d 307].) In *Am-Cal Inv. Co.* v. *Sharlyn Estates, Inc.,* 255 Cal.App.2d 526, 540 [63 Cal.Rptr. 518], cited by defendants, there was hearsay in a letter because it went to prove not only that a certain company was willing to lend a sum of money but that it had the money.

■ The second alleged impediment is that whatever fee arrangements

---

[12] In *Gagnon Co.* v. *Nevada Desert Inn, Inc.,* 45 Cal.2d 448, 455 [289 P.2d 466], quoted in *Aspeitia* v. *California Trust Co.,* 158 Cal.App.2d 150, 153 [322 P.2d 265], the statement that the dismissal terminated the rights of the parties was strictly limited by the modifying phrase, "in that particular action."

there were lacked definiteness, that there was no finalized contract. We are satisfied that the agreement for a contingent fee of 25 percent of the recovery was definite. The acquiescence of Bamford in principle in a higher percentage, which was never crystalized, did not upset the 25 percent arrangement. Skelly, in the breach inducement trial, acceded to limiting his claim to the 25 percent deal.

■ 6. Defendants complain that the instruction defining a contract was too meager.[13] It was adequate. There was little problem of offer and acceptance as to the 25 percent arrangement. The existence of that contract was clear.

■ 7. Defendants urge that the notice-of-contract requirement of Skelly's cause of action was not met because the proof failed to disclose that they had notice of the percentage figure of Skelly's fee contract. This was not necessary. (7 Am.Jur.2d, Attorneys at Law, § 288, p. 208; 85 A.L.R.2d 863, 865; *Grand Rapids & I. Ry. Co.* v. *Cheboygan Circuit Judge* (1910) 161 Mich. 181 [126 N.W. 56].) They both got notice of the contingent arrangement at the first settlement conference, and Richman was reminded on subsequent occasions. This was sufficient.

■ 8. Defendants contend that the evidence is insufficient to establish that Granz and Richman induced Bamford to breach his contract with Skelly.[14]

Motives, either of Bamford for a self-activated breach or of Granz and Richman for inducement of Bamford to breach, are obscure. On the other hand, the actions of Granz, whose proposals originally raised Gochman's suspicions that Skelly was being by-passed, and particularly of Richman, who deceitfully told Gochman that Skelly had been paid and directed him to draw all the documents accordingly, strongly point to an inducement, even though motives therefor are not ideally logical and must be found through somewhat veiled inferences. The preparation of the documents in the form heretofore described amounted to more than the providing to Bamford of an opportunity to avoid paying Skelly; it was an eye-catching "one-way only" direction arrow.

On the point of Bamford's motive, true Skelly and he, before trial, had had differences about advances for costs, Skelly, during trial, had importuned Bamford for a higher percentage for his fee, Skelly, at first, had asked for an additional fee for work on the appeal and had given Richman

---

[13]"A contract is an agreement to do or not to do a certain thing." (Plaintiff's No. 5.)

[14]There is no question that he breached it. He told Skelly over the telephone that he refused to pay and that Skelly could sue him.

an extension of time which Bamford felt he should not have, and Skelly had recommended a discounted settlement and when Bamford demurred, in a sense, had turned the judgment collection over to him. Nonetheless these circumstances, although they might have made Bamford susceptible to inducement, formed no compelling basis for a decision on his part not to pay Skelly anything. He had won a substantial judgment for Bamford. He had agreed to handle the appeal with no raise in the percentage of his fee, despite the fact that even during the trial Bamford had agreed in principle to a higher scale. The record contains no evidence of any statement or action by Bamford intimating that he felt Skelly had disentitled himself to any fee at all or of any pressure by him on Granz and Richman to set up the acquittance so that he could cut Skelly out of his fee until after the Texas visit.

Rather, we feel, the evidence afforded the jury the privilege of drawing inferences, and we must indulge all possible inferences, for two motives on the part of Granz and Richman, to induce Bamford to breach the contract: (1) Granz, with Richman backing him, may have resented the fact that Skelly had engineered the court victory, and so may have much rather seen the client get all of the recovery than the attorney get any part of it. (2) It appears that Bamford must not only have convinced Granz that his appeal was going to be thrown out (the record indicates Granz was fearful of Bamford's motion to dismiss it) but also that he had sound claim to more cash in the payoff than was proposed. Perhaps from one layman to another, Bamford gave Granz concern that if his appeal did not get dismissed, he (Bamford) might establish that all the adjudicated set-offs, which had cut Bamford's claim down from $20,000 to $9,000, should not have been granted. Or perhaps this conviction stemmed from the use of the Hovious judgment in the negotiations. There is some indication that the discount at which Granz bought up the Hovious judgment was about 50 cents on the dollar. In the trial, Granz made a typical equivocal but acceptable concession that he had bought up the Hovious judgment at a discount, saying he believed he had and claiming he could not recall that it had been 50 percent or that he had bought the judgment for a little over $2,000. It was reasonable for the jury to infer that he had acquired it on this basis, considering that Granz seemed quite content to pay to Bamford what was the equivalent of the full amount of his judgment in cash plus the face amount of the Hovious lien (the release of which he was promising), and that $2,000 had been the discount he originally had proposed to Bamford to settle his judgment. As indicated, Gochman told Bamford that Granz had acquired the Hovious judgment. It was open to inference that Bamford learned at least that he had done so at a good discount; that Bamford took the position that he could have gotten the same reduction,

that the release of the Hovious lien should count for no more than its acquisition figure against his judgment and that he had more cash coming; and that Granz and Richman insisted on full value for it and pointed out to Bamford that he could come out all right by not paying Skelly.

The matter of motive is for the trier of fact (*Klein* v. *Lange,* 91 Cal.App. 400, 404 [267 P. 130]). In the state of the record above depicted (competing motives and absences of motives) we feel that the issue of voluntary versus induced breach was one for the jury. We cannot say, as a matter of law, that the evidence of inducement is insufficient. (3 Witkin, Cal. Procedure, Appeal, §§ 87, 88, pp. 2250-2251, 2252; see also *Rogers* v. *Grua,* 215 Cal.App.2d 1, 9 [30 Cal.Rptr. 39].)

9. Defendants are concerned that a combination of certain of the trial court's instructions could have been taken by the jurors as advice that they could bring in a verdict for Skelly by finding that Granz and Richman committed an unlawful act which facilitated Bamford's breach of contract even though there had been no prior inducement to breach; that said unlawful act was making and delivering the payoff check solely to Bamford. They point out that, in truth, such action by Granz and Skelly was not unlawful. We agree with the latter statement, but we believe that defendants' concern as to the portent of the combination of instructions is not well founded. Defendants say that the badge of unlawfulness is applied to the payment to Bamford alone by the instructions declaring that the attorney has authority to receive the funds for and acknowledge satisfaction of judgment unless a revocation of his authority is filed, that the court does not recognize anyone except the attorney of record, that the client can only be substituted *pro se* for a nonagreeing attorney by a court order after a noticed hearing at which the court will set terms for payment of the contingent fee, and that until the adverse party is given written notice of the change, he must recognize the former attorney. Skelly contends, of course, and the statement in Bamford's letter to the Court of Appeal that there was disagreement only as to some aspects of the case indicates that there was no revocation of his authority in the sense of Code of Civil Procedure, section 283, subdivision 2; and it is true that Skelly had not been displaced by a court order. Apparently defendants feel that the instructions dealing with the role of the attorney and client in the process of payment and satisfaction of judgment, which they say are erroneous, are made particularly obnoxious by selected phraseology in the first part of court's instruction No. 1. "A plaintiff who has suffered harm as a . . . result of an . . . interference . . . with a contractual relationship . . . by unlawful means . . . is entitled to recover . . . ." However, these words are only part of the entire paragraph which is obviously introductory. It is followed by the substantive instruction that to secure a verdict in an

action for interference with a contractual right certain elements must be established including one that "[t]he defendant had knowledge of the contract and *intended to induce its breach.*" (Italics supplied.) Thus, inducement of the breach is made the primary factor. (See 26 A.L.R.3d 679, 686, citing *Calbom* v. *Knudtzon* (1964) 65 Wn.2d 157 [396 P.2d 148].) The circumstance that defendants facilitated the breach (whether by lawful or unlawful means) subsequent to their inducement of it is not the significant feature. The reference to interference with contractual relations by unlawful means or lawful but unjustified means in the introductory part of the instruction and to breach causation by a defendant's wrongful or unjustified conduct in the substantive part of the instruction has to do with the means of breach inducement not the method of effecting the breach already induced. ▆▆▆ If the means of inducement is unlawful, there can be no justification. It is clearly actionable. If the means is not unlawful, it is actionable unless shown to be justifiable by the inducer. (26 A.L.R.3d 679, 690.) By unlawful means is meant by such things as illegal detention, physical violence, defamation or fraud. (See 28 Cal.Jur.2d, Interference, § 5, p. 425; *Boyson* v. *Thorn*, 98 Cal. 578 [33 P. 492]; *California Auto Court Assn.* v. *Cohn*, 98 Cal.App.2d 145 [219 P.2d 511].) Where the means of breach inducement is not unlawful such as by economic pressure, the question follows whether it is justified or not. (28 Cal.Jur.2d, Interference, § 2, pp. 422 et seq., and 1970 Supp.; 26 A.L.R.2d 1227; see generally *Imperial Ice Co.* v. *Rossier*, 18 Cal.2d 33 [112 P.2d 631]; *Wise* v. *Southern Pac. Co.*, *supra*, 223 Cal.App.2d 50; *Rogers* v. *Grua*, *supra*, 215 Cal.App.2d 1; *Freed* v. *Manchester Service, Inc.*, 165 Cal.App.2d 186 [331 P.2d 689].) ▆▆▆ Actually there was not too much point in instructing on unlawful means or on justification of lawful means. The only plausible means employed for inducement to breach were simple verbal persuasion or economic pressure; once the inducement is accepted, it is clear that there was no justification for it. (26 A.L.R.3d 679, 691, 698; see also *Herron* v. *State Farm Mut. Ins. Co.*, 56 Cal.2d 202, 207 [14 Cal. Rptr. 294, 363 P.2d 310]; see also *West* v. *Anchor Cas. Co.*, 194 Cal. App.2d 164 [14 Cal.Rptr. 791].) ▆▆▆ The right of a client to terminate the attorney-client relationship at will does not justify breach inducement by a third party. (26 A.L.R.3d 679, 698.)

▆▆▆ Since Granz' and Richman's making and delivery of the check solely to Bamford was not the means of, although it may have been proposed in the course of the inducement, it is not significant in the establishment of the right to recover consequential damages, whether doing so was or was not lawful. However, such act's being a violation of law might have been a factor in connection with the claim for punitive damages just as its being a violation of a known lien right or custom of the profession

might have been. Thus, there is reason to inquire into whether the instructions dealing with the roles of the client and attorney in the payment of and acknowledging satisfaction of a judgment were erroneous or misleading. Code of Civil Procedure, section 283, (quoted in the second part of plaintiff's instruction No. 12) to the effect that the attorney has authority to receive money claimed by his client and to acknowledge satisfaction of the judgment unless a revocation of authority is filed is not a command to the judgment debtor to pay the attorney. What section 283 does is simply to make it proper for the judgment debtor to pay the attorney only (instead of the party or party and attorney) and to give the attorney the right, by his sole execution (not coupled with that of his client), to acknowledge satisfaction of judgment. By this law, the judgment debtor is protected against any subsequent claims of the judgment creditor that the attorney should not have given the satisfaction. The giving of this instruction was superfluous but innocuous. Similarly the trial court properly refused to give defendants' proposed instruction dealing with what might amount to a revocation of authority.

The instructions to the effect that the trial court will recognize no one but the attorney of record and that the adverse party must recognize that attorney until he receives notice of his displacement (although probably related to in-court maneuvers) might have suggested that a judgment payoff has to be made to the attorney and that only he can give a satisfaction of judgment. If they did, they were bad. We find that the authorities support the proposition that the judgment creditor can pay the plaintiff directly and that the latter can give a satisfaction of judgment.[15] (*Calvert* v. *Stoner,* 33 Cal.2d 97, 103 [199 P.2d 297] [contingent fee provision that client cannot compromise without consent of counsel void as against public policy]; *Ferrea* v. *Tubbs,* 125 Cal. 687 [58 P. 308] [tender to client only was valid and stopped running of interest]; 6 Cal.Jur.2d, Rev., Attorneys at Law, § 86, p. 146 [since client can discharge attorney at will he should be able to settle at will]; 26 A.L.R.3d 679, 697.) It is also true, of course, that there was inadvertently included in the exposition of Code of Civil Procedure, section 284, language to the effect that the court in a substitution hearing would set the terms of a contingent fee, which had been declared unconstitutional in *Echlin* v. *Superior Court,* 13 Cal.2d 368 [90 P.2d 63, 124 A.L.R. 719] and deleted from the section in 1967.

This group of instructions was not misleading as to the primary issue

---

[15]The action of the superior court clerk in refusing to accept the client-signed satisfaction for filing partly on the basis that the attorney had not executed it seemed to fortify the erroneous concept that such execution was essential. We do not feel that there should have been a refusal on this basis. However, the clerk had a legitimate second ground for his action—inadequate foreign acknowledgment.

of inducement. Although they were inappropriate, they were not prejudicial, in our opinion, in the area of the basis for punitive damages. This is because the same act which they incorrectly suggested was unlawful was, indeed, contra to a right of lien and to the custom of the profession (both reasonably findable by the jury) which had practically the equivalent effect of showing the type of malice supportive of exemplary damages. Knowledge of this right and custom is readily attributable to Richman. Considering the overall pattern of the activities of Granz and Richman, there was room for inference that Granz, through his contacts with Richman, was at least knowledgeable about the custom of the profession.

10. Since the subject of punitive damages has been mentioned, it is appropriate at this point to give attention to defendants' objection to the trial court's instruction defining fraud.[16] Although some of the alternatives may not have been appropriate, number 4 ("a promise made without intention of performing"—note Richman's promise to Skelly to protect his fee) was; and the preceding instruction, on punitive damages, specified malice, as well as fraud, as one of the qualifiers, defining it as evil motive and willingness to injure.

11. Defendants have voiced serious objection to court's instruction number 2 advising that when the contingent fee is payable from the sum recovered the attorney has a lien which is "a contractual right . . . subject to protection from unlawful interference." They appear to argue that this instruction, although superficial and "hornbook," was a revelation to the jury that there was an alternative, although unpleaded, ground for recovery which was available to Skelly, to wit, disregard of a known lien right, even though Bamford had made his own determination to cut Skelly out of his fee uninfluenced by Granz and Richman. There is a separate cause of action of this nature. (7 Am.Jur.2d, Attorneys at Law, § 294, pp. 210-211; 26 A.L.R.3d 679, 684, 702, citing *Orr* v. *Mutual Benefit Health & Acc. Assn.*, 240 Mo.App. 236 [207 S.W.2d 511, 515], wherein the plaintiff limited himself to his lien action and was not allowed breach inducement recovery; 94 A.L.R. 695 citing *Noell* v. *Missouri Pac. Ry. Co.,* 335 Mo. 687 [74 S.W.2d 7], for the proposition that the defendant has a duty to give the plaintiff's attorney reasonable opportunity to protect his lien; see also 37 A.L.R. 1120; 31 Cal.Jur.2d, Liens, § 55, pp. 298-299; 85 A.L.R.2d

---

[16]"Fraud as used in this instruction is any one of the following:
"1. The suggestion as a fact, of that which is not true, by one who does not believe it to be true. ¶2. The positive assertion, in a manner not warranted by the information of the person making it of that which is not true though he believes it to be true. ¶3. The suppression of that which is true by anyone having knowledge or belief of the fact. ¶4. A promise made without any intention of performing it; or ¶5. Any other act fitted to deceive."

859; and *McCaffey Canning Co., Inc.* v. *Bank of America,* 109 Cal.App. 415, 424 [294 P. 45].) However, the instruction in the instant case was not couched in this frame of reference. Rather, because of its use of the words "unlawful interference," it referred back to the court's instruction on breach inducement and so put the lien right in the category wherein *inducement* of the client not to honor the attorney's lien right was a prerequisite to recovery. Moreover, as indicated, disregard of a lien right may have had bearing on the issue of punitive damages. ▮ Defendants claim that there must be some specific reference to the subject of lien in the contingent fee negotiations for one to eventuate. This does not appear to be the rule. It is sufficient if the fee is a percent of the fund recovered, as distinguished from a percent of the amount recovered. (7 Am.Jur.2d, Attorneys at Law, § 283, p. 204.) In *Isrin* v. *Superior Court,* 63 Cal.2d 153 [45 Cal. Rptr. 320, 403 P.2d 728], the Supreme Court reviewed the subject of attorney's liens in answering the question (in the negative, incidentally) whether the existence of a lien would give the attorney such an interest in the subject of his agency as to make him responsible for financing the litigation, precluding the client from proceeding *in forma pauperis.* It was posed that the early rule of nonrecognition of attorney's liens (*Ex parte Kyle,* 1 Cal. 331) had little vitality left; and allusion was made to a line of cases wherein liens were recognized if the parties manifested an intent that the attorney should look to the judgment as security even though the word "lien" had not been used and even when evidence of such intent was slight. (Pp. 157-158, citing *Wagner* v. *Sariotti,* 56 Cal.App.2d 693, 697 [133 P.2d 430]; *Bartlett* v. *Pacific Nat. Bank,* 110 Cal.App.2d 683, 689 [244 P.2d 91]; *Morrison* v. *Havens,* 24 Cal.App.2d 504 [75 P.2d 515].) Also pointed to were decisions (beginning with cases where the underlying action was for recovery of interest in land, but extending to those where it was for recovery of personal injury damages) saying that a contingent fee contract ipso facto transfers a vested equitable interest in the recovery, with reference specifically (at p. 158) to *Jones* v. *Martin,* 41 Cal.2d 23, 27 [256 P.2d 905]. The tenor of these observations seems to favor a rule that there need not be specific reference to a lien. Defendants claim Skelly's testimony negated a lien, but he merely said that he did not know how to perfect one. There was considerable reference to the fact that his fee would come from any sums collected. The question was one for the jury. It is urged that a revocation of authority to receive payment dissolved any lien. As we have observed, the jury was not required to decide that there had been such a revocation. It probably would not destroy the lien anyway. (7 Am.Jur.2d, Attorneys at Law, § 306, p. 217.)

Defendants urge that the evidence was insufficient to establish their notice

of the existence of a lien. It has been held that where the judgment debtor "has notice of facts sufficient to put a prudent person upon inquiry, it is sufficient to protect the rights of the attorney." (*Northrup* v. *Hayward,* 102 Minn. 307 [113 N.W. 701, 703], cited in 7 Am.Jur.2d, Attorneys at Law, § 288, p. 207.) This would clearly apply to Richman and inferentially to Granz through Richman.

■ 12. Defendants complain of the fact that Steffes was permitted to state reasons for the customs of the profession to which he had testified. It appears that there can be good reason for confining the testimony of the expert to the actual custom. (See 21 Am.Jur.2d, Customs and Usages, § 37, p. 715.) Possibly such confinement might be applied as against the giving of reasons for the custom because although not completely irrelevant, they are superfluous, since the ultimate matter with which the fact finder is concerned is that there is such a custom and not with what brought it about and because the giving of such reasons would be unrewardingly time consuming, would open a collateral area of dispute, and possibly would permit admission of material of a prejudicial nature. However, we do not believe that the introduction of such evidence always would be erroneous. In the instant case we do not feel that the testimony had any of the listed vices. Despite a hint that it would be unethical for an attorney, at least, to ignore the customs of his profession, we see no harm in the response given by Steffes.

■ 13. Defendants say that an ambiguous verdict was never properly corrected, and that the amount of general damages could not be related to the 25 percent contract. The ambiguity (whether there was one verdict jointly applicable to both defendants) was sufficiently resolved under the trial court's direction. The amount of the general damages was compatible with the contingent contract. Juries are prone to set verdicts in round figures. The actual recovery by Bamford from Granz (cash plus release of Hovious judgment) was $9,967.[17] Twenty-five percent of that is $2,491.65, close to the $2,500 awarded. If the jury gave any consideration to interest on the $2,491.65, this would take the figure above the $2,500.

14. Granz points to the inadvertent entry of $743.55 as costs in the judgment. At the hearing on a motion to tax costs, Skelly had filed an amended cost bill in the sum of $658.05 from which the court ordered

---

[17]It is interesting to compare this figure ($9,967) with the amount of the Bamford judgment against Granz in June 1962 plus five months' interest at 7 percent per annum (payoff was in December 1962). $9,559.03 plus $122.25 costs totaling $9,681.28; plus interest of $282.22, yielding $9,963.50.

deleted $19.50. The proper amount for insertion in the judgment therefore is $638.55.

The judgment shall be modified so as to substitute the figure $638.55 for the figure $743.55 on the last line thereof. As so modified the judgment is affirmed, respondent to have his costs. The order denying the motion for judgment notwithstanding the verdict is also affirmed. The appeal from the order denying the motion for new trial is dismissed.

Kaus, P. J., and Stephens, J., concurred.

A petition for a rehearing was denied September 17, 1970.