Filed 11/17/23  Nichols v. North American Specialty Ins. Co. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| F. GLENN NICHOLS,<br><br>     Plaintiff and Appellant,<br><br>     v.<br><br>NORTH AMERICAN SPECIALTY INSURANCE COMPANY,<br><br>     Defendant and Respondent. | B329206<br><br>(Los Angeles County Super. Ct. No. 20GDCV01059) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Margaret L. Oldendorf, Judge.  Affirmed.

F. Glenn Nichols, in pro. per., for Plaintiff and Appellant.

Booth, Mitchel & Strange, Stacie L. Brandt and Craig E. Guenther for Defendant and Respondent.

* * * * * *

This appeal lies at the messy intersection of public construction law, surety law, and the law governing the priority of competing liens. Because there is no concise way to summarize the pertinent law or to state the question presented, it will suffice to say in this introduction that we affirm the trial court's judgment for the surety in this case. What follows is our explanation of why.

## FACTS AND PROCEDURAL BACKGROUND

### I.     The Parties and Their Relationships

#### A.     *The general contractor*

Pickard & Butters Construction, Inc. (PBC) is a general contractor that coordinates and oversees public works projects as well as privately funded projects.[1]  At all times pertinent to this appeal, PBC's president was Mark Butters (Butters).

#### B.     *The attorney*

F. Glenn Nichols (Nichols) is an attorney.  PBC retained Nichols as its attorney pursuant to a retainer agreement executed on January 31, 2012.  In that agreement, PBC "consent[ed]" to Nichols "having a lien on any cause of action . . . , and on the proceeds thereof, including . . . on any recovery, monies or property, obtained by settlement, judgment or otherwise, in satisfaction . . . of any claim [PBC] may have against others, in any matter in which [PBC has] retained

---

1      Although the statutes governing public works projects use the phrase "direct contractor" to describe the entity who contracts with a government entity (Civ. Code, § 8018), we will use the phrase "general contractor" for simplicity's sake.

All further statutory references are to the Civil Code unless otherwise indicated.

2

[Nichols], for purposes of satisfying" any fees or costs PBC owes Nichols.

According to a settlement between PBC and Nichols, PBC owed Nichols $1,499,661.58 as of November 3, 2020.[2] Without any support in the record, Nichols estimates that the amount of his fees now totals over $2 million.

## C. *The surety*

North American Specialty Insurance Company (North American) is a licensed surety company.[3]

PBC entered into two agreements with North American. First, PBC paid North American to issue "payment bonds" for projects for which PBC was serving as the general contractor. These payment bonds obligated North American to pay any subcontractors, materialmen, laborers, and the like (collectively, subcontractors) on the projects should they make a claim for payment against PBC. As discussed below, California law requires general contractors to obtain a payment bond as a condition of being awarded any public works contract. (§§ 9550, 9552, 9554.) Second, PBC and North American signed an indemnity agreement on October 9, 2013. This agreement obligated PBC to indemnify North American for any amounts

---

[2] It appears that Nichols did not comply with rule 1.8.1 of the Rules of Professional Conduct in obtaining his attorney lien against PBC because the retainer agreement nowhere advises PBC of the right to seek advice from independent counsel; however, because the stipulation impliedly recognizes the validity of the attorney lien, we will not wade into that morass.

[3] In the midst of this case, North American changed its corporate name to Swiss Re Corporate Solutions America Insurance Corporation.

3

that North American paid to subcontractors on the projects to satisfy those subcontractors' outstanding claims. The agreement also entitled North American to intervene and control any litigation initiated by PBC as PBC's "attorney in fact."

## II. The Construction Projects

Between 2013 and 2014, PBC was hired as the general contractor to coordinate and oversee five projects pertinent to this appeal, and North American issued a payment bond for each of these projects, as follows:

| Project | Project Owner | Amount of Payment Bond |
|---|---|---|
| 12 Acre Buttonwillow Park Project | Buttonwillow Recreation and Parks District | $913,921.40 |
| Watsonville Health Center Expansion Project | County of Santa Cruz | $1,525,000 |
| Orradre Building Modernization | Salinas Valley Fair, Inc. | $1,285,582 |
| Live Oak Camp Comfort Station | County of Santa Barbara | $722,000 |
| Tank Replacement Project | Colonial Oak Water Company | $324,390 |

## III. North American Pays Subcontractors

After not being paid what they were owed by PBC, various subcontractors on the five projects either (1) brought claims against the payment bonds; or (2) sent "stop payment notices," which, as discussed below, are notices that inform *the project owner* that the subcontractors have not been paid and which

4

statutorily prohibit the project owner from paying the general contractor until those amounts are paid.

Pursuant to the terms of the payment bonds, North American paid off the subcontractors on the five projects at issue in the following amounts:

| Project | Project Owner | Amount North American Paid to Subcontractors |
|---------|---------------|-----------------------------------------------|
| 12 Acre Buttonwillow Park Project | Buttonwillow Recreation and Parks District | $14,237.08 |
| Watsonville Health Center Expansion Project | County of Santa Cruz | $605,371.30 |
| Orradre Building Modernization | Salinas Valley Fair, Inc. | $363,226.55 |
| Live Oak Camp Comfort Station | County of Santa Barbara | $27,022.48 |
| Tank Replacement Project | Colonial Oak Water Company | $27,815.40 |

Once North American paid the subcontractors, their claims against the payment bond were resolved and their stop payment notices were dissolved. Thereafter, and after the close of the period for filing payment bond enforcement actions following the recordation of notices of completion on the projects, PBC could move forward with collecting the proceeds it was owed for the projects.

**IV.   PBC's Actions to Collect From the Project Owners**

   **A.   *Filing of five lawsuits***

   PBC sued all five project owners for breach of contract and to recover unpaid project proceeds.

   Nichols represented PBC in these lawsuits.

   **B.   *Intervention by North American in three of the lawsuits***

   North American learned of three of the lawsuits—namely, the lawsuits against Buttonwillow Recreation and Parks District, the County of Santa Cruz, and Salinas Valley Fair, Inc.  North American then exercised its rights under the indemnity agreement to act as PBC's attorney-in-fact and control each lawsuit on PBC's behalf.  North American invited PBC to continue as a direct participant in settling at least some of the lawsuits, but PBC declined.  Ultimately, North American "as PBC" settled the three lawsuits for the following amounts:

| Project | Project Owner | Settlement Amount |
|---|---|---|
| 12 Acre Buttonwillow Park Project | Buttonwillow Recreation and Parks District | $50,000, plus assignment of $27,556.53 judgment on deposit with Kern County Superior Court |
| Watsonville Health Center Expansion Project | County of Santa Cruz | $650,000 |
| Orradre Building Modernization | Salinas Valley Fair, Inc. | $322,610 |

6

North American retained the entirety of the settlement funds.

### C. *Amounts recovered in other two lawsuits*

PBC prosecuted the remaining two lawsuits—namely, those against the County of Santa Barbara and Colonial Oak Water Company—without North American's intervention; indeed, North American did not know that PBC had filed suit against Colonial Oak Water Company until two years after judgment was entered for PBC in that lawsuit. Ultimately, PBC recovered the following amounts:

| Project | Project Owner | Amount Recovered |
|---|---|---|
| Live Oak Camp Comfort Station | County of Santa Barbara | $30,000 |
| Tank Replacement Project | Colonial Oak Water Company | $140,000 |

North American did not collect any portion of these amounts.

## V. Amounts Collected by Nichols

Nichols collected fees from the proceeds of the two lawsuits that PBC itself prosecuted to completion—namely, he collected $7,000 from the $30,000 recovered against the County of Santa Barbara, and $62,152.45 from the $140,000 recovered against Colonial Oak Water Company.

## VI. The Current Lawsuit

On December 7, 2020, Nichols sued PBC and North American for (1) declaratory relief, and (2) conversion. Specifically, Nichols sought a declaration that *he* was entitled to place his attorney lien on the proceeds of the three lawsuits North American had settled against the project owners on PBC's

behalf because his lien had priority over North American's entitlement to recoupment of what it paid to the subcontractors pursuant to the payment bonds. Relatedly, Nichols sought a finding that North American had wrongfully converted those proceeds.

North American filed reciprocal cross-claims for (1) declaratory relief, and (2) conversion. In a complaint that largely mirrored Nichols's, North American sought a declaration that its claims had priority over Nichols's attorney lien and that *Nichols* had wrongfully converted the $7,000 he collected from the Santa Barbara County proceeds and $27,815.40 of the $62,152.45 he collected from the Colonial Oak Water Company proceeds.

The matter proceeded to a six-day bench trial.

The trial court issued a 30-page statement of decision prepared entirely by North American. In that decision, the court denied Nichols all relief. It issued declarations recognizing North American's rights to the proceeds and also awarded North American $34,815.40 on its conversion claims.

## VII. This Appeal

Following the entry of judgment, Nichols timely filed this appeal.

## DISCUSSION

We begin by commenting on the substandard briefing in this case. Nichols's briefs are incomprehensible to a reader who has not already mastered the 2,000-page record and who is not already intimately familiar with the three complex areas of law at issue here; his briefs provide no overview of the pertinent areas of law and nowhere cite the statutes and precedent fundamental to those areas; and his briefs make assertions that are found nowhere in the written record, and there is no

8

transcript of the six-day trial. The net effect is to leave us playing "Where's Waldo?" with the facts and the law. North American's brief is equally unhelpful. Rather than specifically respond to the arguments Nichols actually raises, North American's brief consists chiefly of block quotations from the trial court's decision, a decision that North American drafted and the trial court adopted without modification. This approach to advocacy—citing one's self over and over—may be convenient for North American, but is utterly useless to us because it makes no effort to translate into plain language—let alone respond to—Nichols's arguments.

Notwithstanding these shortcomings, we are nevertheless able to discern that the correctness of the trial court's judgment on both sets of competing declaratory relief and conversion claims boils down to whether Nichols is entitled to enforce his lien for attorney fees on *the full amount* of proceeds recovered in the lawsuits against the project owners, or instead is limited to the amount left over after North American deducted what PBC owes it for resolving the claims of PBC's subcontractors. At bottom, this turns on the priority of a surety's claims vis-à-vis the priority of an attorney lien. Priority is a legal question that we independently examine. (*Pou Chen Corp. v. MTS Products* (2010) 183 Cal.App.4th 188, 192 (*Pou Chen*) ["The relative priority of the parties' claims is a legal issue that we review de novo"]; accord, *Martinez v. Brownco Construction Co.* (2013) 56 Cal.4th 1014, 1018 [where the "issue involves the application of law to undisputed facts, we review the matter de novo"]; *Boling v. Public Employment Relations Bd.* (2018) 5 Cal.5th 898, 912 [same].)

9

## I. Governing Law

### A. *Law of public works projects[4] and equitable subrogation*

Under California law, a general contractor may begin work on an awarded public construction contract only if it first obtains a payment bond.[5] (§§ 9550, 9552, 9554; *Washington Internat. Ins. Co. v. Superior Court* (1998) 62 Cal.App.4th 981, 986 (*Washington*); see generally § 8038 [defining "public works contract"].) Payment bonds are issued by sureties. (See generally § 2787 [defining "surety" as "one who promises to answer for the debt, default, or miscarriage of another . . ."].) In exchange for receiving a premium paid by the general contractor, the surety issues the payment bond and thereby promises to pay any amounts the general contractor has failed to pay its subcontractors. (§ 9554; *Washington*, at pp. 986-987; *First National Ins. Co. v. Cam Painting, Inc.* (2009) 173 Cal.App.4th

---

**4** Although the Orradre Building Modernization project was a private project contracted by a private project owner (Salinas Valley Fair, Inc.), the parties do not dispute that the law governing private works of improvement is, as pertinent to this case, largely similar. (See, e.g., §§ 8600 & 8606 [payment bonds for private works of improvement], 8522 [stop payment notice].)

**5** California law also requires general contractors to obtain a performance bond (Pub. Contract Code, § 10224), which protects *the project owner* by obligating the surety to step into the general contractor's shoes and complete the project should the general contractor default. (*JMR Construction Corp. v. Environmental Assessment & Remediation Management, Inc.* (2015) 243 Cal.App.4th 571, 594.) Although North American issued performance bonds as to all five projects involved in this litigation, those bonds are not at issue in this appeal.

1355, 1364-1365.)  Payment bonds are critical in public works contracts because the usual mechanism for subcontractors to use in securing payment for services rendered to a general contractor—namely, the mechanic's lien—is unavailable against public property.  (*Washington*, at p. 986; *Pacific Employers Ins. Co. v. State* (1970) 3 Cal.3d 573, 576.)  A subcontractor who is owed money by the general contractor has three options when a payment bond is in place—namely, the subcontractor can (1) assert a claim against the payment bond (§ 9560); (2) sue the general contractor and surety on the payment bond (§§ 9452, 9558); or (3) serve a stop payment notice on the project owner (§§ 9300, 9354, 8044), which obligates the project owner to withhold from its payments to *the general contractor* the amount due to the subcontractor (§§ 9358, 8522).  (See also §§ 8004, 9100, 9564 [options not mutually exclusive].)  No matter which route the subcontractor takes, the surety is obligated under the payment bond and empowered by statute to pay the subcontractor's valid claim(s) for payment.  (Accord, § 9364 [surety may issue a release bond to the project owner that lifts the restrictions imposed by the stop payment notice].)

Once a surety pays a subcontractor's outstanding claim, the surety has two possible avenues by which it can seek reimbursement from the general contractor for that payment.  First and foremost, the surety is generally deemed—by virtue of the doctrine of "equitable subrogation"—to stand in the shoes of the subcontractor and thereby avail itself of any remedy originally available to the subcontractor, including suing the general contractor for the amounts the surety paid on the general contractor's behalf.  (*Golden Eagle Ins. Co. v. First Nationwide Financial Corp.* (1994) 26 Cal.App.4th 160, 167-169; *Leatherby*

11

*Ins. Co. v. City of Tustin* (1977) 76 Cal.App.3d 678, 685, 689; *Merner Lumber Co. v. Brown* (1933) 218 Cal. 136, 140; *American Fidelity Fire Ins. Co. v. United States* (N.D.Cal. 1974) 385 F.Supp. 1075, 1077-1078.) As its name suggests, *equitable* subrogation will not be applied to a surety if doing so will """work any injustice to the rights of others"""—in other words, if doing so would be inequitable. (*Golden Eagle*, at p. 169.) Second, a surety that has entered into an indemnity contract with the general contractor can sue to have the general contractor indemnify it for the amounts the surety paid. (*Top Cat Productions, Inc. v. Michael's Los Feliz* (2002) 102 Cal.App.4th 474, 478 ["the surety's indemnity rights are limited to those it obtained by contract"]; *Washington, supra*, 62 Cal.App.4th at p. 989; *Airlines Reporting Corp. v. United States Fidelity & Guaranty Co.* (1995) 31 Cal.App.4th 1458, 1464 ["a surety . . . is entitled to reimbursement by its principal"].)

### B.     *Law of attorney liens*

An attorney lien (or "charging lien") is a lien that empowers an attorney to collect his unpaid fees and costs from the "proceeds of a prospective judgment" in his client's favor. (*Waltrip v. Kimberlin* (2008) 164 Cal.App.4th 517, 525 (*Waltrip*); *Cetenko v. United California Bank* (1982) 30 Cal.3d 528, 531 (*Cetenko*).) An attorney lien may be created expressly through a contract like a retainer agreement, in which case the language of the contact governs its scope.[6] (*Cetenko*, at p. 531; *Bartlett v. Pacific National Bank* (1952) 110 Cal.App.2d 683, 689 [turning to contractual language to determine whether lien created].)

---

[6]     Attorney liens will also sometimes be implied from the contract language. (*Cetenko, supra*, 30 Cal.3d at p. 531.)

12

As a general rule, an express attorney lien takes effect on the date it is created by contract (*Cetenko*, *supra*, 30 Cal.3d at pp. 531, 534; *Waltrip*, *supra*, 164 Cal.App.4th at p. 525), and has priority over any later-created encumbrances on the proceeds of any prospective judgment to which the lien attaches (§ 2897; *Cetenko*, at pp. 534-536; *Pangborn Plumbing Corp. v. Carruthers & Skiffington* (2002) 97 Cal.App.4th 1039, 1049-1050 (*Pangborn*); accord, *Bluxome Street Associates v. Fireman's Fund Ins. Co.* (1988) 206 Cal.App.3d 1149, 1155 [attorney lien has priority over a later-created attachment to potential recovery]; *Cetenko*, at p. 534 [same, as to later-created judgment against client]; *Brienza v. Tepper* (1995) 35 Cal.App.4th 1839, 1848-1849 (*Brienza*) [same, as to offset from later-created judgment].) This general rule applies whether or not the later-created encumbrancers had notice of the earlier attorney lien. (*Cetenko*, at p. 533; *Waltrip*, at p. 525.)

But "[a]n attorney lien does not always have priority over other liens." (*Waltrip*, *supra*, 164 Cal.App.4th at p. 526.) Two exceptions to the general, "first-in-time" rule are pertinent to this appeal.

First, an earlier-created attorney lien is "'subordinate to the rights'" of an adverse party to "'offset judgments in the same action or in actions based upon the same transaction.'" (*Brienza*, *supra*, 35 Cal.App.4th at p. 1849; *Pou Chen*, *supra*, 183 Cal.App.4th at pp. 193-194 ["the right to offset competing judgments obtained in the same action is superior to an attorney's lien"].)

Second, an earlier-created attorney lien may be subordinated to later-created encumbrances if "[e]quitable considerations and public policy" favor a different priority.

13

(*Waltrip*, *supra*, 164 Cal.App.4th at pp. 525-527; *Pangborn*, *supra*, 97 Cal.App.4th at p. 1054 [also so noting]; *Brienza*, *supra*, 35 Cal.App.4th at pp. 1847-1848 [noting, as to the "equities"]; *Cetenko*, *supra*, 30 Cal.3d at pp. 535-536 [noting, as to "public policy"].)  This flexibility makes sense because an attorney lien is "equitable in nature."  (*Brienza*, at p. 1847.)

## II.    Analysis

With all of this background in mind, the question then becomes:  As between a surety who (due to equitable subrogation) is standing in the shoes of subcontractors whose claims against the general contractor the surety paid off, and an attorney with an earlier-created lien, which party—the subrogated surety or the attorney—has priority to the proceeds the general contractor recovers in a judgment from a project owner?

We answer this question by looking first at how to answer it in a scenario where the answer is clear, and by next examining whether either of the two ways in which *this case* is different from that scenario dictates a different answer.

We start with what we view as the scenario where the answer to the priority question is clear.  Imagine that, contrary to the applicable law discussed above, a public works project *can* be completed and the proceeds released to the general contractor even if the general contractor still owes payment to subcontractors on the project.  With this proviso, assume the following scenario:  The general contractor has sued the project owner for payment; the subcontractors have intervened in that lawsuit to collect their unpaid claims against the general contractor; the surety pays off the subcontractors; the surety, by virtue of the doctrine of equitable subrogation, now stands in the shoes of the subcontractors as a litigant in the general

14

contractor's lawsuit against the project owner; and the general contractor has granted a lien to its attorney in a retainer agreement that predates all of these events.

In this scenario, the surety would be entitled to priority over the attorney to the proceeds recovered from the project owner. To be sure, the attorney lien is "first in time" and thus entitled to priority under the general rule. (§ 2897.) But each of the two pertinent exceptions to that general rule that are noted above apply in this scenario.

First, an earlier-created attorney lien will be "subordinate" to the rights of an adverse party who is seeking to offset amounts it is owed "in the same action" or ""in actions based upon the same transaction."" (*Pou Chen*, *supra*, 183 Cal.App.4th at pp. 193-194; *Brienza*, *supra*, 35 Cal.App.4th at p. 1849.) Here, the surety—as a now-subrogated proxy for the subcontractors—is an adverse party who is seeking to offset the amount *it is owed* in that same action, and that also happens to arise from the same general transaction (namely, the public works project). Thus, the surety's rights fall within this exception and have priority. Not surprisingly, this result dovetails neatly with the result dictated by the language of the attorney lien itself. The amount of money the general contractor owes to the subcontractors reduces the amount of money the general contractor will be permitted to keep from the project owner in the lawsuit; in other words, the amount due to the subcontractors will offset the amount the general contractor receives from the project owner, thereby reducing the net "proceeds" the general contractor will receive in the litigation. Put more simply, the debt to the surety shrinks the pot of money the general contractor obtains from the litigation. Because the pot of money the general contractor obtains from litigation is

15

what constitutes the "proceeds" from that litigation, and because the attorney lien attaches only to the client's "proceeds," the attorney lien does not attach to the amount the general contractor owes the surety.  In other words, the debt to the surety, in effect, has priority over the attorney lien.

Second, and independently, an earlier-created attorney lien does not have priority over a later-created encumbrance if equity and public policy dictate that the competing encumbrance has priority.  (*Waltrip*, *supra*, 164 Cal.App.4th at pp. 525-527; *Pangborn*, *supra*, 97 Cal.App.4th at p. 1054 [also so noting].)  Here, they do.  When it comes to equitable considerations, the priority accorded to attorney liens in the proceeds of litigation rests chiefly on the notion that the attorney has *helped bring those proceeds into being*, such that the attorney—in all fairness and equity—deserves to get a piece of the pie he helped bake.  (*Waltrip*, at p. 526 ["It is the attorney's labor, skill and materials, and his willingness to take the risk of no recovery, that results in the judgment or settlement paid to the debtor"].)  To *not* give the attorney a piece of that pie would be inequitable.  (*Ibid.*; *Haupt v. Charlie's Kosher Market* (1941) 17 Cal.2d 843, 845; *Pangborn*, at p. 1054.)  In the above-described scenario, however, it is the surety—not the attorney—who is most responsible for bringing the "pie" into being:  If the surety had not paid off the outstanding claims of the subcontractors, the project may well never have been completed, and the general contractor would not be entitled to the proceeds it is seeking from the project owner.  Indeed, in the absence of the proviso to the scenario, the law provides that a surety *must* pay off subcontractors before the general contractor can access the pie.  When it comes to public policy considerations, the priority accorded to attorney liens in

16

the proceeds of litigation serves the public policy of ensuring that attorneys will be willing to represent parties with meritorious claims but an inability to pay fees because it guarantees attorneys a bite at the proceeds pie before anyone else. (*Cetenko*, *supra*, 30 Cal.3d at pp. 535-536.) In the above-described scenario, however, prioritizing the surety's right to recover the outstanding claims it paid to the subcontractors on behalf of the general contractor serves the public policy of ensuring that sureties will be willing to issue payment bonds. If there is no protection for sureties to collect what they have paid out pursuant to a payment bond, there will be no payment bonds, no public works projects (because, as noted above, they must be supported by payment bonds), and hence no proceeds to a general contractor against which an attorney can assert a lien. Our Legislature has made it clear that this scenario is to be avoided at all costs when it declared that stop payment notices—which often prompt sureties to pay off subcontractors and hence step into their shoes—"take[] priority over" any other assignment a general contractor makes "pursuant to a public works contract." (§ 9456, subd. (a).) Thus, as between those competing public policies of ensuring a supply of attorneys or a supply of sureties willing to issue payment bonds, protecting the latter seems to be the more compelling public policy—and one that justifies according priority to the debts owed to subrogated sureties.

Of course, the facts of this case differ from the scenario we have just discussed in two ways. Do either of these two "wrinkles" counsel in favor of a different answer? We conclude the answer is "no."

The first wrinkle is that the surety in this case, through the exercise of its power under the indemnity agreement as an

17

attorney-in-fact for PBC, also stepped into PBC's shoes in three of PBC's lawsuits against the project owners. Thus, North American settled all three lawsuits "as PBC," and from those proceeds paid itself the debts PBC owed it "as the subcontractors." Does this affect our analysis of priority? It does not, because the equities and public policy considerations dictating priority to the surety still apply with equal force.

The second wrinkle is that the subcontractors in this case did not intervene in any of PBC's lawsuits against the project owners, so North American—as the subrogated surety—never stepped into the shoes of an adverse party during the pendency of any of those lawsuits. Does this additional wrinkle affect our analysis of priority? It does not. Instead of the surety asserting its priority to the proceeds *before* they are calculated in the lawsuit against the project owner (that is, by asserting its subrogated rights to payment from the general contractor within the general contractor's very own lawsuit against the project owner), the surety is asserting its priority to the proceeds *after* they are calculated in the lawsuit against the project owner (that is, by keeping the proceeds of the settlement it reached "as PBC," effectively asserting its subrogated rights to payment from the general contractor after the general contractor has settled its lawsuit against the project owner). But this does not affect the applicability of either pertinent exception to the general rule favoring the priority of earlier created attorney liens. Although North American is not an "adverse party" "in the *same action*," it is effectively asserting its priority in a different action "based on the same transaction" (that is, the public works projects at issue here). Further, and independently, whether North American asserts its rights *before* or *after* the proceeds to PBC are

18

calculated has no impact whatsoever on the balance of equities and public policy.

## III. Nichols's Arguments

Nichols responds with what boils down to three arguments.

First, Nichols insists that his attorney lien is entitled to priority over North American's claims against PBC because his lien was created "first in time." Nichols is correct that his lien is entitled to priority under the general rule that looks to whether the attorney lien is first in time. But Nichols ignores that this rule has exceptions, and that one or both of those exceptions applies here, as explained above.

Second, Nichols contends that we should hold off deciding whether he or North American has priority in light of a pending lawsuit in San Bernardino County, the first phase of which went to trial last month. In that lawsuit, North American has sued PBC for breach of the indemnity agreement, based in part on PBC's failure to repay the amounts North American paid to the subcontractors. PBC has cross-claimed for breach of the agreement, alleging that North American (1) paid the subcontractors more than their claims were worth, and (2) settled PBC's lawsuits against the project owners for less than they were worth. Nichols observes that the San Bernardino County Superior Court could ultimately find that North American acted wrongly in paying the subcontractors too much or in settling PBC's lawsuits for too little. That is true, but irrelevant to *this* lawsuit. The thrust of this lawsuit—and the entirety of the competing declaratory relief claims—is *the priority* as between North American and Nichols; the *amount* of proceeds is

secondary.[7] (Cf. *Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co.* (1996) 47 Cal.App.4th 464, 485 ["bare allegation of surety bad faith, or other misdeeds" is insufficient "to defeat a surety's right to be indemnified"].) Although the conversion claims turn more on the amounts paid, offsets may be made in the other case to account for the ruling in this case. This is why we also find nothing problematic about North American's concession (in one of its trial court filings) that Nichols is entitled to collect his lien against $107,958.12 of the project proceeds; North American's acknowledgement that there is some leftover pie after it collects what it paid the subcontractors does not affect North American's priority. Perhaps most fundamentally, *Nichols* is the instigator and driving force of the lawsuit underlying this appeal—and has continued to press up through this appeal notwithstanding the ongoing San Bernardino case. Nichols has been keeping his foot on the proverbial gas pedal of this case, and even now, he has yet to lift his foot by asking for a stay; we will not throw up roadblocks just because he is unhappy with where the car is taking him.

Third and lastly, Nichols argues that the trial court erred in awarding North American damages on its conversion claims because (1) those claims were untimely under the three-year statute of limitations for conversion (Code Civ. Proc, § 338, subd. (c)(1)), no exception to that limitations period applies, and Nichols's 2016 conversion of proceeds from the County of Santa Barbara and 2019 conversion of proceeds from Colonial Oak Water Company occurred more than three years before North

---

**7** Thus, we reject Nichols's argument that the trial court was prohibited from deciding priority *at all* because, in so doing, it must necessarily examine the amounts due.

20

American's 2022 claim for conversion; and (2) even if there is an exception to this limitations period, North American was on notice that *Butters* had taken some of the Santa Barbara County proceeds based on an e-mail dated July 18, 2016. We reject both arguments. The first argument lacks merit because while the three-year limitations period for conversation begins to run from the date of the conversion, that three-year clock "is not absolute" and can be delayed where there has been fraudulent concealment; here, the trial court found that Nichols, an "attorney . . . experience[d] in construction law," "knew that PBC had entered into an indemnity agreement" under which North American "expected to be reimbursed from" the project proceeds, yet Nichols never disclosed his possession of these proceeds until he was deposed in this case in January 2022. (*Strasberg v. Odyssey Group, Inc.* (1996) 51 Cal.App.4th 906, 916; see generally *Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 807 [claim does not accrue until plaintiff discovers, or has reason to discover, the cause of action].) The second argument lacks merit because notice that *Butters* obtained funds does not impart notice that *Nichols* obtained funds. They are two different people.

*   *   *

In light of our analysis, we have no occasion to reach the parties' further arguments regarding whether Nichols's representation of North American, without disclosing his attorney lien, in one short-lived action by a subcontractor constitutes a violation of the ethical rules and thereby renders Nichols's attorney lien void. (See Rules Prof. Conduct, rule 1.8.1.)

## DISPOSITION

The judgment is affirmed.  North American is entitled to its costs on appeal.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.

HOFFSTADT

We concur:


_____, P. J.

LUI


_____, J.

CHAVEZ

22